IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2025 DEC 22  PM 3: 16
CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

| | |
|---|---|
| Jake Heath-Grey, | ) |
| Plaintiff, | ) Case No.: 1:25 CV02115 ADA |
| v. | ) |
| Texas Department of Agriculture, | ) Jury Trial Demanded |
| Susan Maldonado, and | ) |
| Terry Keel | ) |
| Defendants. | ) |

**PLAINTIFF'S INITIAL PETITION**

COMES NOW the Plaintiff, by and through their undersigned counsel, and asserts the following demands for relief against the Texas Department of Agriculture, Susan Maldonado, and Terry Keel, as follows:

**JURISDICTION AND VENUE**

1. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which provides district courts with jurisdiction over civil actions arising under the United States Constitution or laws of the United States.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) due to a substantial portion of the events giving rise to the claims in this action occurring in this District.

3. At all times relevant to Plaintiff's Petition, Defendant Texas Department of Agriculture ("TDA") was Plaintiff's employer, and Plaintiff was Defendant's employee within the meaning of Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, and the Americans with Disabilities Act.

4. At all times material to the Complaint, Defendant TDA was an "employer" within the meaning of all applicable statutes and employed more than fifteen people.

## PARTIES

5. Plaintiff Jake Heath-Grey is an individual over the age of nineteen and a resident of Travis County, Texas at the time of the relevant events.

6. Defendant Texas Department of Agriculture ("TDA") is a governmental entity and division of the State of Texas. The principal office location for the Texas Department of Agriculture is 1700 Congress Avenue, Austin, Texas 78701.

7. Defendant Susan Maldonado is an individual over the age of nineteen and a resident of Travis County, Texas at the time of relevant events. Ms. Maldonado works as General Counsel for Defendant TDA.

8. Defendant Terry Keel is an individual over the age of nineteen and a resident of Travis County, Texas at the time of relevant events. Mr. Keel works as Deputy Commissioner for Defendant TDA.

## ADMINISTRATIVE PROCEEDINGS AND PROCEDURAL HISTORY

9.  Plaintiff filed an EEOC Charge on or about April 29, 2025, alleging national origin and disability discrimination, as well as retaliation. Plaintiff's EEOC Charge placed Defendants on fair notice of the claims Plaintiff brings in this lawsuit.

10. Plaintiff filed his EEOC charge within 180 days of the last act of discrimination to which he was subjected, his termination.

11. Plaintiff timely filed his EEOC charge.

12. The EEOC issued a Notice of Right to Sue on September 25, 2025.

13. Plaintiff filed this Initial Petition less than 90 days after the Notice of Right to Sue was issued.

14. Plaintiff exhausted the administrative prerequisites prior to filing this Initial Petition.

## GENERAL ALLEGATIONS

15. Based on information and belief, Plaintiff alleges that, at all times mentioned herein, Defendants and their personnel were acting within the course, scope, purpose, consent, knowledge, ratification, and authorization of such agency, employment, joint venture, and conspiracy.

16. Based on information and belief, Plaintiff alleges that, at all times mentioned herein, there may be unknown Defendants who were the agents, servants, and employees, co-venturers, and co-conspirators of Defendants and were, at all times herein mentioned, acting within the course, scope, purpose, consent, knowledge, ratification, and authorization of such agency, employment, joint venture, and conspiracy.

17. As a direct and proximate result of Defendants' violations of existing law, as herein described, Plaintiff has been compelled to retain the services of counsel and has thereby incurred, and will continue to incur, legal fees and costs.

## RELEVANT FACTS

18. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

19. Plaintiff is a Caucasian male and citizen of the United Kingdom. Plaintiff has suffered from Type I Diabetes since birth, for which he wears a glucose monitor and self-administers insulin shots daily.

20. Plaintiff has also been diagnosed with Dyscalculia and Adjustment Disorder.

21. Plaintiff was employed by TDA as a Grants Specialist III. He began his employment on or about March 15, 2024. He was solely involved in administration of Young Farmer Grants ("YFG").

22. YFGs were TDA awards of state and federal tax Dollars to farmers between ages 18 and 46 for the purchase of equipment, seeds, etc. They required a one-to-one match by recipients and were only available for individuals, not companies.

23. During his tenure, Plaintiff noticed and reported many instances of suspected fraud with the YFG program. He viewed it as one of his responsibilities to identify and report instances of suspected fraud within the program.

    a. On November 13, 2024, he provided supervisors Mindy Fryer and Katherine Neilson, via Microsoft Messenger, a variety of documents outlining instances of suspected fraud within the YFG program.

b. Plaintiff reported a fake signature provided by grantee, Yvan Rukazambuga (GFY2024083). Namely, Ms. Rukazambuga wrote a letter in support of a YFG application by Globe Grown, Inc., a company that claims to have developed laser shooting robots to kill weeds in crop fields, and attached as "her signature" a digital copy of a signature found to be, via reverse image search, that of former Goshen, Indiana mayor, Jeremy Stutsman.

c. On December 17, 2024, Plaintiff reiterated his concerns of suspected fraud in the YFG application program to supervisors and human resources.

d. On January 2, 2025, he attended a conference call with Bradine Griffiths, Julia Rico, Felipe Herrera, and Nicole Caston, and pointed out specific instances of suspected fraud within the YFG program. During the call, Ms. Rico referred to him as "Jake the foreigner," a hostile and discriminatory reference meant to impugn his character.

e. On January 29, 2025, Plaintiff sent an email to Ms. Emilia Nunes, Administrator for Human Resources, and Ms. Padron-Vasquez expressing that he felt he was being subjected to a hostile and discriminatory environment by his direct supervisors and that he felt his supervisors were continuing to fund suspected fraudulent YFG applications.

f. On January 30, 2025, Plaintiff emailed Ms. Nunes and Ms. Padron-Vasquez regarding grant payment request GYFF2024086-PMT-04, pointing out an ineligible expense of electricity, which had also been incorrectly approved in the past. He included screenshots of the guidance documents showing that electricity was an ineligible expense and questioned why it continued to be approved.

24. On December 17, 2024, Plaintiff filed a complaint with human resources alleging that his superiors, Ms. Karen Reichek, Administrator for Trade and Business Development, Ms. Mindy Fryer, Director for Rural Programs and Financial Assistance, and Ms. Katherine Neilson, Team Leader, harassed, bullied and retaliated against him due to his national origin and his health conditions.

    a. Plaintiff complained that on November 13, 2024, he provided details of his ongoing YFG work, including where the work was saved, the status of the tasks and necessary next steps, prior to taking his pre-approved annual leave – from November 14, 2024 until November 30, 2024.

    b. When he returned to work on December 2, 2024, Ms. Fryer and Ms. Neilson organized a YFG meeting with Plaintiff in which they became hostile and accusatory, stating that he had not saved his work where he claimed and another employee had to complete his work while he was out.

    c. Three investigations were conducted, all of which were closed on March 19, 2025, finding no evidence of bullying, harassment or retaliation by Reichek, Fryer or Neilson. Defendant Keel approved and signed the findings and approved Plaintiff's termination just two days later.

25. In December 30, 2024, Plaintiff submitted a request for reasonable accommodation based on complications from Type I Diabetes, Dyscalculia, and Adjustment Disorder. He requested permission to work from home for five days per week as a reasonable accommodation. At the time of his request, all employees of his division were working from home two days per week.

    a. Due to the anxiety caused by TDA's office environment - namely, the oppressive, hostile and discriminatory environment created by his supervisors and their unwillingness to investigate the issues of fraud that he had raised - Plaintiff's glucose levels were becoming unmanageable.

    b. He was experiencing dizziness and vision problems, causing him to stop driving to/from work. Instead, he was incurring the expense of using ride share services to take him to/from work.

    c. As measured by his glucose monitor, his glucose was averaging more than 100% higher on days that he was forced to perform his work duties in office.

26. On December 31, 2024, Plaintiff provided to TDA Dr. Cort Pedersen's diagnosis of Adjustment Disorder, expressing that "due to considerable anxiety caused by interpersonal stress in the office, it is difficult for [Plaintiff] to concentrate on his work," requesting that Plaintiff be permitted, as a reasonable accommodation to, "work full-time from home and not have to come into the office."

27. On January 29, 2025, TDA held the first interactive meeting with Plaintiff, Ms. Reichek, Ms. Fryer, Ms. Padron, and Ms. Nunes in attendance. Plaintiff expressed in this meeting that his work was identical whether performed at home or in office, with the only difference being the anxiety from the hostile environment created by his superiors in the office. He stressed that the accommodation request was reasonable in that it would result in no added expense, imposition or inconvenience for TDA and would make him more productive.

28. On February 11, 2025, Plaintiff amended his request and filed a second AHR-524, specifying his Adjustment Disorder, Type I Diabetes and Dyscalculia, noting calculation and concentration difficulties related to spikes in his glucose levels. His physician, Nurse

      Practitioner Karisa Stancil, recommended that he be removed from TDA's stressful office environment, explaining that if Plaintiff were "able to work from home he will be more productive and less likely to have diabetic DKA, etc."

29. On March 17, 2025, the second interactive meeting was held. In attendance were Plaintiff, Plaintiff's counsel, Ms. Nunes, Ms. Padron, Ms. Reichek, Ms. Fryer, and Ms. Susan Maldonado, General Counsel for TDA.

    a. Ms. Nunes incorrectly stated that Plaintiff had not provided documentation of his dyscalculia – despite it being provided on the AHR-524 from February 11, 2025.

    b. Plaintiff's counsel expressed that Plaintiff was experiencing dizziness and blurred vision, making it difficult to drive to work – that Plaintiff had at that time been using rideshare services to get to/from work for several months.

    c. Plaintiff's counsel expressed that the stress and anxiety from the hostile and discriminatory work environment fostered by Plaintiff's supervisors was aggravating Plaintiff's glucose levels, which was in turn aggravating the other symptoms Plaintiff was experiencing.

    d. Plaintiff's counsel explained that the data from Plaintiff's glucose monitor indicated glucose levels were spiking by more than 100% on days he worked in office.

    e. Plaintiff's counsel and Ms. Maldonado agreed at the end of the meeting that Plaintiff's counsel would send appropriate documentation and data to Ms. Maldonado. However, TDA would terminate Plaintiff just four days later – before Plaintiff's counsel had an opportunity to send the additional data to TDA.

30. Defendants claim two reasons for Plaintiff's termination: 1) a high error rate on processing payment requests; and, 2) that Plaintiff was insubordinate in communications with Ms. Maldonado. Plaintiff disputes both of these.

31. Any errors relating to payment requests were due to calculation problems with TDA's software.

    a. These issues were well documented via numerous emails from Plaintiff to IT and help desk personnel.

    b. On December 16, 2024, Plaintiff reported the persistent technical issues to the Helpdesk, which confirmed that there was continued malfunctioning of the software.

    c. On January 1, 2025, Dustin Johnson, Deputy Chief Information Officer with TDA, reached out to Plaintiff to try to address some of the ongoing IT issues.

    d. A performance deficiency relating to Plaintiff's error rate was not communicated to Plaintiff prior to his filing the above-mentioned human resources complaint regarding his superiors.

32. The "insubordination" of which Ms. Maldonado complains related to two emails that Plaintiff sent to Ms. Maldonado asking for her Bar number.

    a. Instead of providing her Bar number, Ms. Maldonado responded to the first email informing Plaintiff that if he was making the request as a private citizen, he could file the request under the Texas Public Information Act.

    b. Plaintiff responded from his personal email address, stating that he was requesting the information "as a Private Citizen." Further, he inquired as to whether TDA

  adhered to Texas Government Code, Section 81.101, which defines the "practice of law," in relation to the unauthorized practice of law.

 c. It is clear from these communications that Plaintiff was simply trying to verify Ms. Maldonado's status as a member of the state Bar. Further, it is clear from his second email that he was doing so "as a Private Citizen." *Ex. A, TDA's Position Statement*, at p.10. TDA's Position Statement makes it clear that Ms. Maldonado also understood his request to be made "in his capacity as a private citizen." *Id.* at p.9.

 d. In TDA's Position Statement, Ms. Maldonado makes clear that the second email, the email sent in Plaintiff's capacity as a private citizen, caused her to conclude that Plaintiff "sent the email to question [her] education, authority to practice law in the State of Texas, or abilities as a licensed attorney." *Id.* at p.10. She further makes clear that Plaintiff was "terminated on March 21, 2025, for his unprofessional conduct which rose to the level of insubordination by exhibiting disrespect and disregard for TDA management…" and his "conduct demonstrated a lapse in judgment and a lack of professional discretion" that was "not acceptable or tolerated per [TDA's] Ethics Policy." *Ibid.*

33. As Ms. Maldonado explained, Plaintiff had no daily interactions with her – the two had only met once, three days earlier (March 17, 2025) during the second interactive meeting regarding Plaintiff's accommodation request, in which Ms. Maldonado noted he was "professional and cordial." *Ex. A*, p.10.

34. Ms. Maldonado acknowledged in her Memo justifying Plaintiff's termination that she and Plaintiff had only ever exchanged one email prior to March 20, 2025 - just a few days

earlier in the week – and that their interactions had been "extremely limited." *Ex. B, TDA Termination Memo,* dated 3/21/2025, at p.4.

35. She expressed in the Memo that she found Plaintiff's email "incredibly disrespectful and offensive…" and that she could "identify no other reason that [Plaintiff] would direct emails concerning [her] professional license and the agency's compliance with state law, other than to question [her] education, authority to practice law in the State of Texas, or abilities as a licensed attorney." *Ibid.* "His final email of the day further implies that TDA and me specifically are not complying with governing law." *Ibid.*

36. Defendant Maldonado, in her personal capacity, violated Plaintiff's rights, and retaliated against Plaintiff, when she recommended termination due to his request for her state Bar number. Defendant Maldonado further retaliated against Plaintiff when she recommended termination in response to Plaintiff's reasonable accommodation request, and just four days after the second interactive process meeting.

37. Defendant Keel, in his personal capacity, violated Plaintiff's rights, and retaliated against Plaintiff, when he approved Plaintiff's termination due to his request of Ms. Maldonado's state Bar number. Defendant Keel further retaliated against Plaintiff when he approved termination in response to Plaintiff's human resources complaints, which were closed by Mr. Keel just two days earlier.

38. Defendant TDA, through it personnel's actions, violated Plaintiff's rights, and retaliated against Plaintiff, when Plaintiff was terminated due to his request of Ms. Maldonado's state Bar number, his reasonable accommodation request and his human resources complaint.

39. Defendants' acted with reckless or callous indifference to Plaintiff's rights.

40. Defendants' conduct caused plaintiff physical injury, mental and emotional distress, humiliation, mental anguish and suffering, lost wages and benefits, relocation expense and legal expenses.

## CAUSES OF ACTION

### COUNT 1: RETALIATION IN VIOLATION 42 U.S.C. § 1983

41. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

42. Plaintiff alleges that Defendant violated his First and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

43. The Supreme Court (SCOTUS) has identified "the public interest in having free and unhindered debate on matter of public importance" as being the core value of the free speech clause of the First Amendment. *Pickering v. Board of Education*, 391 U.S. 563, 573 (1968).

44. SCOTUS employs two elements in evaluating whether public employees have been retaliated against in violation of the First Amendment: 1) whether the speech was made as a private citizen on a matter of public concern; and, 2) whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. See, *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)).

45. It is clear from Plaintiff's correspondence, as well as Ms. Maldonado's understanding of that correspondence, that Plaintiff requested Ms. Maldonado's Bar number as a private citizen.

46. Plaintiff's request was based on a matter of public concern – whether Ms. Maldonado was licensed to practice law and whether TDA adheres to state law requiring that people representing themselves as attorneys be licensed to practice law.

47. Regarding justification of Plaintiff's termination, TDA, via Ms. Maldonado, provided that Plaintiff was terminated for "unprofessional conduct which rose to the level of insubordination by exhibiting disrespect for TDA management." *Ex. A*, p.10.

48. The *Pickering* Court made clear that this is insufficient justification for suppression of speech – "statements are in no way directed towards any person with whom [Pickering] would normally be in contact in the course of his daily work...[t]hus no question of maintaining either discipline by immediate supervisors or harmony among coworkers is presented here." *Pickering*, at 569-70.

49. Plaintiff's email was a private correspondence between only he and Ms. Maldonado. It contained nothing objectively disrespectful, insubordinate or unprofessional. TDA has presented no argument or evidence that Plaintiff's email interfered with TDA's ability to promote "the efficiency of the public services it performs through its employees." *Id.* at 568.

50. Ms. Maldonado acted under color of state law when terminating Plaintiff as she did so in her capacity as General Counsel for the Texas Department of Agriculture.

51. TDA's termination of Plaintiff violated his First and Fourteenth Amendment rights.

52. TDA has retaliated against Plaintiff in violation of his First and Fourteenth Amendment rights.

53. TDA's violations have damaged Plaintiff.

54. Plaintiff seeks a damages award consisting of lost wages, physical injury, emotional distress and attorney's fees and costs.

## COUNT 2: RETALIATION IN VIOLATION OF

## THE AMERICANS WITH DISABILITIES ACT

55. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

56. Plaintiff has disabilities within the definition of the ADA: Type I Diabetes; Dyscalculia; and, Adjustment Disorder.

57. Plaintiff filed a complaint with human resources against his superiors, Reichek, Fryer, and Neilson, alleging bullying, harassment and retaliation relating to his medical conditions.

58. The ensuing three investigations were closed and approved by Defendant Keel with no findings on March 19, 2025.

59. Defendant Keel approved Plaintiff's termination on March 21, 2025, just two days after approving and closing the three investigations.

60. Plaintiff avers that his termination was in retaliation for filing the human resources complaints. The temporal proximity of his termination to the closing of the three investigations supports a finding that Plaintiff's termination was motivated by the human resources complaints and investigations.

61. Plaintiff made a reasonable accommodation request to work from home full time.

62. Plaintiff's request was reasonable in that it placed no undue burden on Defendant's resources or personnel.

63. Plaintiff engaged in two interactive process meetings, the second taking place on March 17, 2025.

64. Just four days later, Plaintiff suffered an adverse action on March 21, 2025, namely termination.

65. TDA retaliated against Plaintiff in violation of the ADA.

66. TDA's violations of the ADA damaged Plaintiff.

67. Plaintiff seeks a damages award consisting of back pay, front pay, emotional distress and attorney's fees and costs.

## COUNT 3: RETALIATION IN VIOLATION OF
## THE CIVIL RIGHTS ACTS OF 1866 AND 1964

68. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

69. Plaintiff is a member of a protected class as he is of British descent and a British citizen.

70. Plaintiff, in all respects, was performing his job in a manner that was consistent with Defendant's legitimate expectations.

71. Plaintiff filed a complaint with human resources against his superiors, Reichek, Fryer, and Neilson, alleging bullying, harassment and retaliation relating to his national origin.

72. The ensuing three investigations were closed and approved by Defendant Keel with no findings on March 19, 2025.

73. Defendant Keel approved Plaintiff's termination on March 21, 2025, just two days after approving and closing the three investigations.

74. Plaintiff avers that his termination was in retaliation for filing the human resources complaints. The temporal proximity of his termination to the closing of the three investigations supports a finding that Plaintiff's termination was motivated by the human resources complaints and investigations.

75. Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights under the Civil Rights Acts of 1866 and 1964.

76. As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff has suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court:

A. Enter judgment in favor of Plaintiff and against Defendants for violations of Plaintiff's rights under First and Fourteenth Amendments of the US Constitution, 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Civil Rights Acts of 1866 and 1964;

B. Declare that the actions of Defendants constituted unlawful suppression of Plaintiff's speech, discrimination and retaliation;

C. Award Plaintiff actual damages, including, but not limited to, lost wages, benefits, and relocation expenses, in an amount of not less than $10,000;

D. Award Plaintiff damages due to his suffering of physical injury and mental and emotional distress, in an amount of not less than $2,500,000;

E. Award Plaintiff punitive damages for Defendants' reckless and callous indifference to Plaintiff's rights, in such amount as the Court deems just and proper;

F. Award Plaintiff his costs, attorneys' fees, and non-taxable expenses in this action;

G. Grant Plaintiff such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiff hereby demands trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: December 22, 2025

Respectfully submitted,

s/Nicholas H. Parks
Nicholas H. Parks
The Parks Law Firm, P.C.
Alabama Bar No: 7306M46B
Texas Bar No: 24058032
PO Box 200
Shannon, AL 35142
Phone: 214-991-2642
Fax: 214-441-6425
Email: nhparks@gmail.com
